**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

____

|  |  |  |
|---|---|---|
| | : | |
| ENGAGE HEALTHCARE | : | |
| COMMUNICATIONS, LLC; | : | |
| GREEN HILL HEALTHCARE | : | Civil Action No. 12-787 (FLW)(LHG) |
| COMMUNICATIONS, LLC; and | : | |
| CENTER OF EXCELLENCE | : | |
| MEDIA, LLC, | : | |
| | : | |
| | : | **OPINION** |
| Plaintiffs, | : | **(Filed Under Seal)** |
| | : | |
| v. | : | |
| | : | |
| INTELLISPHERE, LLC, | : | |
| MICHAEL J. HENNESSY & | : | |
| ASSOCIATES, INC., ARC MESA | : | |
| EDUCATORS, LLC, MICHAEL J. | : | |
| HENNESSY, JOHN DOES 1 TO 5; | : | |
| JANE DOES 1 TO 5, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**WOLFSON, United States District Judge:**

Pending before the Court are two separate motions for summary judgment. First

Defendants Intellisphere, LLC, Michael J. Hennessy & Associates, Inc., Arc Mesa Educators,

LLC, and Michael J. Hennessy, individually (collectively, "Defendants") move for summary

judgment on all claims in the First Amended Complaint ("FAC") filed by Plaintiffs Engage

Healthcare Communications, LLC, Green Hill Healthcare Communications, LLC, and Center of

Excellence Media, LLC (collectively, "Plaintiffs"). Defendants also seek summary judgment on

Count One of their Second Amended Counterclaim. Second, Plaintiffs separately cross-move for

1

summary judgment seeking a declaratory judgment dismissing and/or cancelling Defendants' pending trademark applications and existing registered trademarks.

The present matter, a long-running and contentious dispute between two medical publishing companies controlled by competing members of the same family, stems from Defendants' purported infringement of 16 trademarks that Plaintiffs use as titles for magazines, seminars, and continuing education courses. At issue are the following six claims brought by Plaintiff: (1) trademark infringement under 15 U.S.C. § 1125(a); (2) trademark infringement – unfair competition under 15 U.S.C. § 1125(a); (3) false designation of origin under 15 U.S.C. § 1125(a); (4) declaratory judgment under 28 U.S.C. §2201, *et seq*; (5) an unfair competition claim under N.J.S.A. 56:4-1l; and (6) a New Jersey common law unfair competition claim. Also at issue is Defendants' counterclaim seeking a declaration that Defendants are not infringing on ten other of Plaintiffs' marks that are not set forth in Plaintiffs' First Amended Complaint ("FAC").

For the reasons that follow, Defendants' motion for summary judgment is granted in its entirety and Plaintiff's motion for summary judgment is denied in its entirety.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  Parties

Plaintiffs Engage Healthcare Communications, LLC ("Engage") and Green Hill Healthcare Communications, LLC ("Green Hill") are medical publishing companies that distribute medical publications to physicians, pharmacists, healthcare professionals, and/or healthcare payers. Defendants' Statement of Undisputed Material Facts ("DSOF") at ¶¶ 1-4. Plaintiff Center of Excellence Media, LCC ("Center of Excellence") provides continuing medical education to physicians, nurses, and pharmacists. *Id.* at ¶ 2. Defendants Intellisphere,

LLC ("Intellisphere") and Michael J. Hennessy & Associates, Inc. ("MJH & Associates") are also medical publishers. *Id.* at ¶ 5. Defendant Arc Mesa Educators, Inc. ("Arc Mesa") provides continuing medical education courses and materials. *Id.* at ¶ 6. Defendant Michael J. Hennessy is Chairman and Chief Executive Officer of both Intellisphere and MJH & Associates, and is the brother of John J. ("Jack") Hennessy, II, the Chairman of Plaintiff-entities. *Id.* at ¶ 1; FAC at ¶ 51. Both Plaintiffs and Defendants distribute their materials free of charge or at little cost to the consumer, DSOF at ¶¶ 3, 8, and the companies compete directly for advertisers, editorial board members, and readers. Plaintiffs' Statement of Undisputed Material Facts ("PSOF") at ¶ 24.

**B. Background**

The present dispute concerns 16 trademarks for titles of magazines, seminars, and continuing education courses that Plaintiff filed between 2008 and 2011.  Plaintiffs contend that during 2011 and into 2012, Defendants filed trademark registration applications for competing publications, articles and other materials "bearing the exact same or confusingly similar trade names as trade names already being utilized by Plaintiffs." PSOF at ¶ 6. The parties have stipulated as to which of Defendants' marks are alleged by Plaintiffs to infringe Plaintiffs' marks. They are as follows:

| Plaintiffs' Marks | Defendants' Marks |
| --- | --- |
| PERSONALIZED MEDICINE IN ONCOLOGY<br><br>PERSONALIZED MEDICINE IN HEMATOLOGY/ONCOLOGY | PERSONALIZED MEDICINE IN HEMATOLOGY/ONCOLOGY |
| THE ONCOLOGY NURSE<br><br>THE ONCOLOGY NURSE APN/PA | ONCNURSE |

| Plaintiffs' Marks | Defendants' Marks |
|---|---|
| VALUE-BASED CANCER CARE<br><br>VALUE-BASED ONCOLOGY CARE | VALUE-BASED ONCOLOGY |
| ONCOLOGY PHARMACY NEWS<br><br>CLINICAL ONCOLOGY PHARMACY NEWS | ONCOLOGY PHARMACY NEWS |
| ONCOLOGY PRACTICE MANAGEMENT | ONCOLOGY BUSINESS MANAGEMENT |
| AMERICAN HEALTH & DRUG BENEFITS | AMERICAN JOURNAL OF PHARMACY BENEFITS |
| PEER-SPECTIVES | PEERS & PERSPECTIVES |
| TARGETED THERAPIES IN HEMATOLOGY/ONCOLOGY<br><br>TARGETED THERAPIES IN ONCOLOGY<br><br>TARGETED THERAPIES IN BREAST CANCER<br><br>TARGETED THERAPIES IN LUNG CANCER<br><br>TARGETED THERAPIES IN NONHODGKIN LYMPHOMA | INTERNATIONAL CONGRESS ON TARGETED THERAPIES IN CANCER<br><br>INTERNATIONAL JOURNAL OF TARGETED THERAPIES IN CANCER<br><br>BIOMARKERS, PATHWAYS, AND TARGETED THERAPIES<br><br>TARGETED THERAPY NEWS |

ECF No. 213 at 3-4.

### C. Plaintiffs' Marks

None of Plaintiffs' marks currently has a principal registration. DSOF at ¶ 32. Some are listed on a supplemental register (which is for marks that are descriptive without acquired distinctiveness); others are the subject of applications in proceedings suspended by the U.S.

Patent and Trademark Office ("PTO"); there were some registrations that were cancelled by the PTO. *Id.*

Plaintiffs contend that all of their marks are protectable as either arbitrary, suggestive, or descriptive with secondary meaning.[1] They contend that their use of the following marks is arbitrary as applied to International Class 35[2] advertising and (in one case) trade show services: PERSONALIZED MEDICINE IN ONCOLOGY, THE ONCOLOGY NURSE-APN/PA, VALUE-BASED ONCOLOGY CARE, ONCOLOGY PHARMACY NEWS, CLINICAL ONCOLOGY PHARMACY NEWS, ONCOLOGY PRACTICE MANAGEMENT, PEER-SPECTIVES, AMERICAN HEALTH AND DRUG BENEFITS, TARGETED THERAPIES IN HEMATOLOGY/ONCOLOGY, and TARGETED THERAPIES IN ONCOLOGY. DSOF at ¶ 28. For each mark claimed as arbitrary, Plaintiffs assert that "[a]lthough each of the components in the [MARK NAME] mark evinces a meaning, the mark as a whole does not describe Plaintiffs' advertising [and in one case] trade show services recited in Class 35." *Id.*  The advertising services provided by Plaintiffs associated with these marks are advertising space in publications to pharmaceutical companies or biotechnology companies, which purchase and place advertisements in those publications. *Id* at ¶ 49.

---

[1] As discussed in Part III.A *infra*, trademarks are only protectable if they are arbitrary, suggestive, or descriptive with secondary meaning (i.e. acquired distinctiveness).

[2] "International Classes" refer to the trademark classes utilized by the PTO in registering marks. By way of example, Plaintiffs seek to register PERSONALIZED MEDICE IN ONCOLGY in International Class 35 for "Advertising services, namely, providing advertising space in magazines, journals, newsletters, articles, feature reports, monographs, supplements to printed publications in the fields of oncology and web sites . . . for advertising goods and services that concern information in the fields of hematology and oncology." DSOF at ¶ 13(d)

Plaintiffs contend that their use of all of their marks is suggestive as applied to the Classes 9,[3] 16,[4] and 41[5] services. DSOF at ¶ 30. For each mark claimed as suggestive, Plaintiffs assert in substantially similar form that "[a]lthough each of the components in the [MARK NAME] mark evinces a meaning, the mark as a whole does not describe Plaintiffs' goods and services recited in Classes 9, 16, and[/or] 41." *Id.*

Plaintiffs contend that, if descriptive, the following marks have acquired secondary meaning based on their use in the classes described above: THE ONCOLOGY NURSE-APN/PA, THE ONCOLOGY NURSE, PERSONALIZED MEDICINE IN HEMATOLOGY/ONCOLOGY, ONCOLOGY PHARMACY NEWS, VALUE-BASED CANCER CARE, CLINICAL ONCOLOGY PHARMACY NEWS, ONCOLOGY PRACTICE MANAGEMENT, AMERICAN HEALTH & DRUG BENEFITS, TARGETED THERAPIES IN BREAST CANCER, TARGETED THERAPIES IN LUNG CANCER, TARGETED THERAPIES IN NONHODGKIN LYMPHOMA, TARGETED THERAPIES IN HEMATOLOGY/ONCOLOGY, TARGETED THERAPIES IN ONCOLOGY. *Id.* at ¶ 31.

---

[3] For example, Plaintiffs seek to register PERSONALIZED MEDICE IN HEMATOLOGY/ONCOLGY in International Class 9 for "Downloadable electronic magazines, journals, newsletters, feature reports, monographs and electronic supplements to the foregoing in the fields of hematology and oncology." DSOF at ¶ 12(a).

[4] For example, Plaintiffs seek to register PERSONALIZED MEDICE IN HEMATOLOGY/ONCOLGY in International Class 16 for "Printed publications, namely, peer reviewed medical magazines, journals, newsletters, feature reports, monographs, and printed supplements to the foregoing in the fields of hematology and oncology." DSOF at ¶ 12(b).

[5] For example, Plaintiffs seek to register PERSONALIZED MEDICE IN HEMATOLOGY/ONCOLGY in International Class 41 for "Online educational services, namely, providing continuing education courses and exams in the fields of hematology and oncology via a global computer information network; providing online information about continuing education in the fields of hematology and oncology." DSOF at ¶ 12(d).

It is undisputed that each of Plaintiffs' marks describe the content of their associated publications, seminars, or continuing education courses. *Id.* at ¶¶ 33-48. For instance, Plaintiffs' publication bearing the VALUE-BASED ONCOLOGY CARE mark contains information about "providing cost effective care for oncology." *Id.* at ¶ 38.

### D.  Defendants' Marks

Plaintiffs assert that eleven of Defendants' marks at issue in the FAC infringe on Plaintiffs' own marks. They maintain that Defendants adopted all of their trademarks, and filed applications for registration of their trademarks (all in International Classes 9, 16, 35, and/or 41), without a prior search for any similar trademark registrations and applications in the PTO. PSOF at ¶ 35.

As for seven of Defendants' marks, Plaintiffs contend that Defendants never used them in commerce sufficient to establish any right to apply for registration: PERSONALIZED MEDICINE IN HEMATOLOGY/ONCOLOGY; VALUE BASED ONCOLOGY; ONCOLOGY PHARMACY NEWS; INTERNATIONAL CONGRESS ON TARGETED THERAPIES ON CANCER; INTERNATIONAL JOURNAL ON TARGETED THERAPIES ON CANCER; TARGETED THERAPY NEWS; BIOMARKERS, PATHWAYS, TARGETED THERAPIES. ECF No. 284-1 at 2.

As to the remaining marks—ONCNURSE, PEERS & PERSPECTIVES, AMERICAN JOURNAL OF PHARMACY BENEFITS, and ONCOLOGY BUSINESS MANAGEMENT—Plaintiffs contend that Defendants offered inconsistent first-use dates. It is unclear from Plaintiffs' Statement of Facts what these inconsistencies are for each of the marks, but for ONCNURSE, in various applications with the PTO, Defendants asserted a first-use-date

of October of 2010, yet Defendants' corporate representative admitted at his deposition that the mark was first used as a title of a publication in September 2011. PSOF at ¶ 55.

### E. PEER-SPECTIVES/PEERS & PERSPECTIVES

A central issue in the case is whether there is a likelihood of consumer confusion between Plaintiffs' mark, PEER-SPECTIVES, and Defendants' mark, PEERS & PERSPECTIVES. Center for Excellence filed an application for the mark PEERSPECTIVES in International Class 41 on June 11, 2008. PSOF at ¶ 121. The trademark PEER-SPECTIVES was registered on the principal register on January 27, 2009, *id*; however, Center of Excellence permitted the mark to lapse on August 28, 2015, but filed a new registration application as of February 24, 2017 that is still pending. *Id.* at ¶ 122. Intellisphere filed an intent-to-use application for the mark PEERS & PERSPECTIVES in International Classes 9, 16 and 41 on May 9, 2011. *Id* at ¶ 123. On October 24, 2011, Intellisphere filed an affidavit of use, alleging that the date of first was "June 00, 2011." *Id* at ¶ 124. The trademark PEERS & PERSPECTIVES was registered on the principal register on January 17, 2012. *Id.*

Defendants always use the PEERS & PERSPECTIVES mark in conjunction with their MD MAGAZINE mark (which is not at issue in this case), such that it appears as MD MAGAZINE, PEERS & PERSPECTIVES. DSOF at ¶ 127.

### F. Defendants' Declaratory Judgment Counterclaim

Defendants seek a declaratory judgment that Defendants are not infringing on other marks owned by Plaintiffs (separate from those already discussed) that utilize similar formatives (i.e., "value-based," "personalized medicine," "targeted therapies"), because these marks are

unenforceable. DSOF at ¶ 156. The at-issue marks and Defendants' potentially infringing marks

(if any) are as follows:

| Plaintiffs' Marks | Defendants' Marks |
| --- | --- |
| JOURNAL OF PERSONALIZED MEDICINE IN HEMATOLOGY/ONCOLOGY<br><br>PERSONALIZED CANCER CARE<br><br>PERSONALIZED MEDICINE IN IMMUNOLOGY<br><br>PERSONALIZED MEDICINE IN RHEUMOTOLOGY<br><br>PERSONALIZED BREAST CANCER<br><br>PERSONALIZED VALUE BASED CANCER CARE | PERSONALIZED CANCER CARE |

| Plaintiffs' Marks | Defendants' Marks |
|---|---|
| PERSONALIZED VALUE BASED CANCER CARE | VALUE -BASED CARDIOLOGY |
| VALUE-BASED BREAST CANCER | VALUE-BASED CARDIOLOGY CARE |
| VALUE-BASED CARE IN RHEUMOTOLOGY | VALUE-BASED DESIGN |
| VALUE-BASED CARE IN MULTIPLE MYELOMA | VALUSE-BASED INSURANCE DESIGN |
| VALUE-BASED ONCOLOGY BENEFIT DESIGN | |
| TRANSLATING EVIDENCE-BASED RESEARCH INTO VALUE-BASED DECISIONS | |
| INSTITUTE FOR VALUE-BASED MEDICINE | |
| CLINICAL ONCOLOGY PHARMACY | N/A |
| RHEUMATOLOGY BUSINESS MANAGEMENT | N/A |
| DERMATOLOGY BUSINESS MANAGEMENT | |
| DIABETES BUSINESS MANAGEMENT | |

ECF No. 213 at 3-4.

The first class of marks for which Defendants seek a declaratory judgment are marks that

Plaintiffs filed with the PTO on an intent-to-use basis. These marks are: PERSONALIZED

VALUE-BASED CANCER CARE, PERSONALIZED MEDICINE IN IMMUNOLOGY,

PERSONALIZED BREAST CANCER, VALUE-BASED BREAST CANCER, RHEUMATOLOGY BUSINESS MANAGEMENT, DERMATOLOGY BUSINESS MANAGEMENT, and DIABETES BUSINESS MANAGEMENT. DSOF at ¶ 159. The second class of marks for which Defendants seek a declaratory judgment are marks for which Plaintiffs have claimed some use in commerce. These are: JOURNAL OF PERSONALIZED MEDICINE IN HEMATOLOGY/ONCOLOGY, PERSONALIZED MEDICINE IN RHEUMATOLOGY, VALUE-BASED CARE IN MULTIPLE MYELOMA, VALUE-BASED ONCOLOGY BENEFIT DESIGN, CLINICAL ONCOLOGY PHARMACY, VALUE-BASED CARE IN RHEUMATOLOGY, and PERSONALIZED CANCER CARE. *Id.* at ¶ 163. Although Plaintiffs have presented some evidence that these marks brought in revenue, they have not presented any other evidence as to whether these marks have attained secondary meaning. *Id.* at ¶¶ 168-69.

### G. Procedural History

On December 7, 2011, Plaintiffs, through their counsel, sent a cease-and-desist letter to Intellisphere and MJH & Associates regarding several of Defendants' marks. PSOF at ¶ 7. Intellisphere filed a cancellation proceeding before the Trademark Trial and Appeal Board ("TTAB") of the PTO, seeking the cancellation of Plaintiffs' registration for the mark VALUE-BASED CANCER CARE. *Id.* at ¶ 8. On February 9, 2012, Plaintiffs filed a Complaint against Defendants, alleging, *inter alia*, trademark infringement and unfair competition. ECF No. 1. On February 27, 2012, Plaintiffs filed the FAC. ECF No. 10. On May 18, 2016, Defendants filed their Second Amended Answer to the FAC and their Second Amended Counterclaim. ECF No. 195. On August 11, 2016, the Magistrate Judge appointed a Special Master to handle discovery disputes. ECF No. 205. The Special Master, on October 30, 2017, issued an opinion granting

11

Defendants' application to compel Plaintiffs' Rule 30(b)(6) designee to testify as to when Plaintiffs' descriptive marks first acquired secondary meaning, which the Magistrate Judge later modified, compelling the designee to testify as to whether the marks had attained secondary meaning as of the date of Defendants' first use. *Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*, No. 12-787, 2017 WL 9481037, at *1 (D.N.J. Oct. 30, 2017), *report and recommendation adopted as modified*, No. 12-787, 2017 WL 6539242 (D.N.J. Dec. 21, 2017).

Plaintiffs' FAC asserts the following eight claims against Defendants: (1) trademark infringement under 15 U.S.C. § 1125(a); (2) trademark infringement – unfair competition under 15 U.S.C. § 1125(a); (3) false designation of origin under 15 U.S.C. § 1125(a); (4) declaratory judgment under 28 U.S.C. §2201, *et seq*; (5) an unfair competition claim under N.J.S.A. 56:4-1l; (6) a New Jersey common law unfair competition claim; (7) false advertising under 15 U.S.C. § 1125; and (8) tortious interference with prospective contractual relationships.[6]

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for

---

[6] As Plaintiffs have moved to voluntarily dismiss Counts 7 and 8, these Counts are dismissed. Further, in its Second Amended Counterclaim, Defendants brought three counterclaims: 1) a claim for a declaratory judgment of non-infringement, under 28 U.S.C. §§ 2201-02; 2) a common law unfair competition claim; and 3) an unfair competition claim under N.J.S.A. 56:4-1. As Defendants state that they are amenable to dismissal of Counts 2 and 3 if the Court grants their summary judgment motion, Counts 2 and 3 of Defendants' Second Amended Counterclaim are also dismissed.

the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson,* 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor .'" *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson,* 447 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Curley v. Klem,* 298 F.3d 271, 276–77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. *Celotex,* 477 U.S. at 330. "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 138 (3d Cir. 2001). The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence,* 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted). Under *Anderson,* plaintiffs' proffered evidence must be sufficient to meet the substantive evidentiary standard the jury would have to use at trial. 477 U.S. at 255. To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324 (quotations omitted); *see also Matsushita,* 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley,* 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits

of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.,* 972 F.2d 53, 55 (3d Cir.1992).

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' motion for summary judgement presents three issues for adjudication: 1) whether Plaintiffs' marks are protectable, 2) whether there is a likelihood of confusion between Plaintiffs' mark PEER-SPECTIVES (if protectable) and Defendants' mark PEER & PERSPECTIVES sufficient to support a claim for trademark infringement; and 3) whether summary judgement is warranted on Defendants' counterclaim seeking a declaratory judgment that additional marks belonging to Plaintiffs are not protectable. For the following reasons, the Court finds that the Plaintiffs' marks, except for PEER-SPECTIVES, are not protectable; that PEER-SPECTIVES is not likely to confuse potential consumers; and that summary judgment is warranted on Defendants' declaratory judgment counterclaim.

### A. Protectability of Plaintiffs' Trademarks

For every claim at issue in the FAC, Plaintiffs must prove: (1) ownership of a mark; (2) that the mark is valid and legally protectable; and (3) that defendant's "use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services." *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.,* 214 F.3d 432, 437 (3d Cir. 2000) (citing *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 192 (3d Cir.1990)); *see also J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 374 (D.N.J. 2002) (elements of a Lanham Act claim for trademark infringement are the same for both Lanham Act and New Jersey unfair competition claims).[7] Defendants argue that summary judgement should be granted in their favor on all of these counts because none of Plaintiffs' marks are legally protectable.

In determining whether a mark is legally protectable, courts use a hierarchy of mark classifications: (1) generic marks; (2) descriptive marks; (3) suggestive marks; and (4) arbitrary or fanciful marks. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc*., 237 F.3d 198, 221 (3d Cir. 2000). "In order to qualify for Lanham Act protection, a mark must either be suggestive, arbitrary, or fanciful, or must be descriptive with a demonstration of secondary meaning*." Id.* at 222.

---

[7] As Lanham Act unfair competition claims and common law unfair competition claims are treated identically, Plaintiff's argument that Defendants did not address the New Jersey common law claim is without merit. *See New Piquante Brands Int'l, Ltd. v. Chloe Foods Corp.*, No. 08-4248, 2009 WL 1687484, at *5 (D.N.J. June 16, 2009) ("Notwithstanding its intended reach, the analysis of a common law claim for unfair competition under New Jersey law mirrors that of a Lanham Act claim," and courts, therefore, "subsume their analysis of a common law unfair competition claim into their evaluation of a plaintiff's Lanham Act claim") (internal citations omitted).

Although there is some confusion as to whether the categorization of a mark is a question of law or fact, the Third Circuit has held that "[t]he characterization of a mark is a factual issue for the jury." *Ford Motor Co. v. Summit Motor Prods., Inc*., 930 F.2d 277, 292 n. 18 (3d Cir. 1991). However, mark classification, "as with any question of fact[,] can be resolved on summary judgment if the evidence is so one-sided that there can be no doubt about how the question should be answered." *interState Net Bank v. NetB@nk, Inc.*, 221 F. Supp. 2d 513, 516 (D.N.J. 2002) (internal citations omitted). This Court, therefore,

> must determine whether there remains any genuine factual issue regarding the classification of the…mark that could affect the resolution of this matter. Therefore, if facts are at issue that could cause a reasonable jury to decide the mark is a descriptive mark with secondary meaning or a suggestive mark, then the mark would be protected by trademark law and summary judgment for Defendant would be improper. If, instead, the mark can only be classified as generic or as a descriptive mark without secondary meaning, the mark is not protected by trademark law and summary judgment is proper.

*J & J Snack Foods, Corp.*, 220 F. Supp. at 376. Applying these principles, courts frequently resolve categorization questions on summary judgment. *See id.* (ruling on summary judgment that the disputed mark was descriptive). *See also E.T. Browne Drug Co. v. Cococare Prod., Inc.,* 538 F.3d 185, 201 (3d Cir. 2008) (concluding on summary judgment that mark was not protectable); *Lamberti v. Positano Ristorante, Inc*., No. 04-4485, 2005 WL 627975, at *7 (E.D. Pa. Mar. 16, 2005) (same); *Mateson Chem. Corp. v. Vernon*, No. 96-7914, 2000 WL 796737, at *6 (E.D. Pa. May 9, 2000) (same); *Patient Transfer Sys., Inc. v. Patient Handling Sols., Inc.*, No. 97-1568, 1999 WL 54568, at *7 (E.D. Pa. Jan. 29, 1999) (same).

Here, Plaintiffs argue that ten of their marks—at least as applied to certain classes of use—are arbitrary and that all of their marks are protectable as suggestive marks. Defendants

contend that all of Plaintiffs' marks are descriptive and lacking secondary meaning, and, therefore, not protectable.

## 1. Advertising Service Mark Registration

As to ten of Plaintiffs' marks, [8] Plaintiffs do not argue that they are arbitrary publication titles or educational materials associated with the marks, but rather they bear no logical or suggestive relationship to advertising services in those publications (International Class 35).[9] Before addressing whether the marks can be classified as arbitrary, Defendants first argue that the at-issue marks are not registerable as advertising "service marks," i.e. marks that identify and distinguish the source of services (here, advertising), as opposed to goods. 15 U.S.C. § 1053.

The Federal Circuit analyzed this issue in *In re Advertising & Marketing Development, Inc.,* 821 F.2d 614 (Fed. Cir.1987)). There, the court set out a three-part test to determine whether a mark is registerable in relation to advertising services: 1) "advertising services must be sufficiently separate from the subject of the advertising;" 2) the "mark must be used to identify advertising services, not merely to identify the subject of the advertising;" and 3) the specimen

---

[8] Plaintiffs contend that the following marks are arbitrary as applied to advertising and/or show services: PERSONALIZED MEDICINE IN ONCOLOGY, THE ONCOLOGY NURSE APN/PA, VALUE-BASED ONCOLOGY CARE, ONCOLOGY PHARMACY NEWS, CLINICAL ONCOLOGY PHARMACY NEWS, ONCOLOGY PRACTICE MANAGEMENT, AMERICAN HEALTH & DRUG BENEFITS, TARGETED THERAPIES IN HEMATOLOGY/ONCOLOGY, TARGETED THERAPIES IN ONCOLOGY, and PEER-SPECTIVES. DSOF at ¶¶ 28-29.

[9] "Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they 'bear no logical or suggestive relation to the actual characteristics of the goods.'" *A & H Sportswear, Inc.*, 237 F.3d at 221 (citation omitted). In contrast, the test for descriptiveness is not whether the mark perfectly describes the corresponding good/service, but whether it "describe[s] a characteristic or ingredient of the article to which it refers . . . ." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986).

must "show a 'direct association' between the mark and the services named in the application." *Id* at 619-20. The direct association test requires "that [the mark] be used in such a manner that it would be readily perceived as identifying such services." *Horizon Healthcare Servs., Inc. v. Allied Nat., Inc.*, No. 03-4098, 2006 WL 344277, at *7 (D.N.J. Feb. 14, 2006) (citing *In Re Moody's Inv'rs Serv. Inc.*, 13 U.S.P.Q.2d 2043 (T.T.A.B. Nov. 17, 1989)).

 In *Horizon Healthcare Services*, a healthcare administrator sought to trademark the term "Horizons" in relation to a promotional brochure used to market the administrator's "Horizons Temporary Health" health care insurance plan to consumers. *Id.* The court found that the mark did not meet the requirements of the *In re Advertising* analysis because, on summary judgment, the administrator had not presented evidence supporting each of the factors: 1) "[T]he brochure does not evidence any separation between the advertising service and the subject of the advertising, the insurance plan," 2) "The Horizons mark is used only to identify the subject of the advertising, the insurance plan, and not advertising or marketing services," and 3) "the specimen does not show any association between "Horizons" and advertising or marketing services." *Id.* As such, the court found that "the mark is not used in a manner such that "Horizons" would be readily perceived as identifying cooperative marketing and advertising services." *Id.*

 Here, as in *Horizons*, the marks are not protectable as advertising service marks. Although it is possible that there is separation between the advertising services that Plaintiffs offer and the subject of the advertising, *see In re Advertising*, 821 F.2d at 619 (holding that advertising company's mark "THE NOW GENERATION", was trademarkable as an advertising service mark, in part, because the company's "sale of advertising services to banks and

automobile dealers… are sufficiently separate from the subject of the advertising, *i.e.,* financial services and automobiles"), Plaintiffs have presented no evidence of any such separation here. Moreover, even if there were such a separation, the at-issue marks clearly fail the second two prongs of the analysis. First, the marks do not identify the advertising service as opposed to the subject of the advertising. For example, Plaintiffs seek to register ONCOLOGY PHARMACY NEWS in relation to the advertising space it offers in its pages, yet it also seeks to register it under International Class 16 as a "peer reviewed medical magazine[ ], journal[ ], newsletter[ ], feature report[ ][,] monograph [ ] and printed supplement[ ] to such printed publication[ ] in the fields of hematology, oncology and pharmacy." DSOF at ¶ 18. The name, "ONCOLOGY PHARMACY NEWS," on its face, clearly identifies the services referenced in the Class 16 application—namely, news in the fields of hematology, oncology, and pharmacy—and not any ancillary advertising services that the publication might offer. This is also true for the other marks for which Plaintiffs seek advertising service mark registration, as all of these are similar publication titles that, on their face, refer to the contents of the publications. For the same reasons, there is no "direct association" such that the marks would be readily perceived as identifying the advertising services. *See also In re Hartford Courant Co.*, 231 U.S.P.Q. 77 (T.T.A.B. Aug. 6, 1986) (finding that Hartford Courant newspaper's mark COURANT was not registerable for "newspaper advertising services, including the design, layout and production of display advertisements for a newspaper").

In seeking these advertising service mark registrations, Plaintiffs attempt to rely on the PTO's decision in *In Re Forbes Inc.*, 31 U.S.P.Q.2d 1315 (T.T.A.B. May 3, 1994). There, the PTO found that Forbes Magazine's mark NO GUTS. NO STORY, which the magazine used in

advertisements that encouraged others to run their ads in Forbes Magazine, was protectable as an advertising service mark. Importantly, the court found that seeking advertising service mark registration for the phrase NO GUTS. NO STORY was distinguishable from seeking advertising service mark registration for the title of a publication. The PTO stated that "an important factor in determining whether the activity engaged in is a service for which a service mark registration may issue is the use by applicant of a mark different from that used in connection with applicant's principal product." *Id.* NO GUTS. NO STORY, in contrast to the Forbes publication title, was "used to identify the actual advertising activities in connection with the aforementioned publications" and "[t]here is nothing in the record to indicate that applicant uses NO GUTS. NO STORY in conjunction with any goods or services other than its advertising services." *Id*. Here, unlike in *In re Forbes*, Plaintiffs use the marks to identify Plaintiffs' principal product, not specifically the advertising services. As such, Plaintiffs' reliance on *In re Forbes* is misplaced.

Thus, none of Plaintiffs' marks are protectable as advertising service marks.

2. Marks are not Suggestive

In addition to claiming that certain marks are arbitrary for advertising services, Plaintiffs argue that all of the at-issue marks are suggestive as applied to Classes 9, 16, and/or 41; *i.e.*, for downloadable electronic publications, printed publications, and online educational services. Suggestive terms "suggest rather than describe the characteristics of the goods." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986). "The descriptive-suggestive borderline is hardly a clear one [but] [t]he most popular test with the courts is the 'imagination' test." *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 857-58 (3d Cir. 1992) (internal quotations omitted). Under the test, "[a] term is suggestive if it requires imagination, thought or perception to reach a

conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 858 (quoting *A.J. Canfield, Co.,* 808 F.2d at 297; *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968)). In addition to the amount of imagination required to connect the term in question with a characteristic of the product or service being marketed, courts have considered "whether sellers of similar products [or services] are likely to use, or actually do use, the term in connection with their goods." *Id.* (citing *Security Ctr., Ltd. v. First Nat'l Security Ctrs.,* 750 F.2d 1295, 1299 (5th Cir. 1985)). "Frequent use of a term by sellers of similar products or services tends to indicate that the term is descriptive or generic rather than suggestive." *Id.*

Here, 15 of the 16 marks are not, as a matter of law, protectable as suggestive. For example, it does not take any element of imagination to connect PERSONALIZED MEDICINE IN ONCOLOGY to electronic and print publications and online educational services in the fields of oncology. *See id.* (holding that "little imagination is necessary in order to get from "INJURY–1" to personal injury lawyers). The same is true for the following of Plaintiffs' marks: PERSONALIZED MEDICINE IN HEMATOLOGY/ONCOLOGY; THE ONCOLOGY NURSE; THE ONCOLOGY NURSE APN/PA; VALUE-BASED CANCER CARE; VALUE-BASED ONCOLOGY CARE; ONCOLOGY PHARMACY NEWS; CLINICAL ONCOLOGY PHARMACY NEWS; ONCOLOGY PRACTICE MANAGEMENT; AMERICAN HEALTH & DRUG BENEFITS; TARGETED THERAPIES IN HEMATOLOGY/ONCOLOGY; TARGETED THERAPIES IN ONCOLOGY; TARGETED THERAPIES IN BREAST CANCER; TARGETED TEHERAPIES IN LUNG CANCER; and TARGETETED

THERAPIES IN NONHODGKIN LYMPHOMA. Each of these titles describes the content of its respective publication and/or online educational service, a fact that Plaintiff's corporate representative repeatedly admitted, asserting, for instance, that the VALUE-BASED CANCER CARE mark contains information about "providing cancer care on a cost efficient basis." DSOF at ¶ 37; *see generally* DSOF at ¶¶ 33-42, 44-48.

Further, Plaintiffs' marks contain words that are frequently used by sellers of similar products or services. Indeed, Plaintiffs' marks consist almost entirely of common healthcare industry jargon, such as "value-based," "targeted therapies," and "personalized medicine" and medical specialties/conditions, such as hematology or oncology. Other names are actual medical professions, i.e. THE ONCOLOGY NURSE and ONCOLOGY NURSE APN/PA. Defendants include evidence from the PTO website, revealing a host of third-party applications for marks using the phrase "value-based," "targeted therapies," and "personalized medicine," as well as pending registrations or applications including the words "THE ONCOLOGY NURSE." DSOF at ¶¶ 96-99. They also point to the fact that Google searches result in 71 million hits for the term "value based," 16 million hits for the term "personalized medicine," and 4.9 million hits for the term "targeted therapies." DSOF at ¶¶ 104-106. Moreover, identical marks or near-exact copies of these marks are also titles to websites and textbooks, and there are multiple references to these terms in the Patient Protection and Affordable Care Act. *Id.* at ¶¶ 101-102, 107. *See Dranoff-Perlstein*, 967 F.2d at 864 (finding that Injury-1 was not suggestive, in part, because "[t]he record contains the Philadelphia area 'yellow pages' advertisements of no fewer than twenty local lawyers and law firms...contain[ing] the word 'injury' or 'injured'").

The same is not true for PEER-SPECTIVES, however. Although Defendants are correct that abbreviated or combined words are not necessarily suggestive, this is not an instance, as in the cases cited by Defendants, in which such marks were held to be descriptive. *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1152-53 (10th Cir. 2013) (affirming summary judgment on issue that SINUCLEANSE mark is descriptive for a sinus cleaning solution); *see also Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1341-42 (2d Cir. 1992) (affirming summary judgment that ARTHRITICARE mark is descriptive for a topical treatment for arthritis); *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 415-16 (D.N.J. 2011) (granting summary judgment that FANCASTER is descriptive for a product pertaining to "sports and other fan-related broadcasting videos"). Whereas little imagination is required to tie SINUCLEANSE to a sinus cleaning solution, a "mental leap" is required to tie PEER-SPECTIVES to online and in-person continuing medical education classes for physicians. Indeed, Plaintiffs' representative testified that "Peer" was chosen because "[h]ealth care professionals like to talk Peer to Peer," and "perspectives" was chosen because "people want to hear key leader perspectives on certain medical information." DSOF at ¶ 43. Absent this explanation, any link between the words and the healthcare industry would not have been immediately apparent, a clear indication that the mark is merely suggestive.[10]

Thus, 15 of 16 of Plaintiffs' Marks are descriptive; however, PEER-SPECTIVES is suggestive, and, therefore, protectable.

      3.  <u>Secondary Meaning</u>

---

[10] Plaintiff's argument that PEER-SPECTIVES is arbitrary fails, as there is *some* logical or suggestive relation" between the mark and "peer-to-peer" perspectives from physicians that Plaintiffs contend are the basis for the service. *A & H Sportswear,* 237 F.3d at 221.

Given that Plaintiffs' marks (aside from PEER-SPECTIVES) are descriptive, they are not entitled to protection unless they have secondary meaning, *i.e.*, acquired distinctiveness. *A.J. Canfield Co.*, 808 F.2d at 297 (no trademark right for descriptive mark, unless claimant can show that consumers identify the term with the claimant). Plaintiffs contend that 13 of 16 marks have acquired secondary meaning.[11] "Secondary meaning exists when the mark 'is interpreted by the consuming public to be not only an identification of the product or services [covered by the mark], but also a representation of the origin of those products or services.'" *Commerce Nat'l*, 214 F.3d at 438 (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F. 2d 1225, 1232 (3d Cir. 1978)). Generally, secondary meaning requires extensive advertising that creates an association in consumers' minds between the goods/services covered by the mark and the source of the goods/services. *Id.* The burden of proving secondary meaning is upon the party alleging infringement of a descriptive mark. *Ginger Grp., Ltd. v. Beatrice Companies, Inc.*, 678 F. Supp. 555, 560 (E.D. Pa. 1988) (citing, *inter alia*, *Scott Paper Co.*, 589 F.2d at 1228; *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 816 (1st Cir. 1987)).

Although the Third Circuit in *Commerce National* established eleven factors with which to determine the existence of secondary meaning,[12] a plaintiff must, at the threshold, prove that the "mark possessed secondary meaning *at the time the defendant commenced his use of the*

---

[11] Plaintiffs **do not** contend that PERSONALIZED MEDICINE IN ONCOLOGY, VALUE-BASED ONCOLOGY CARE, AND PEER-SPECTIVES have attained secondary meaning. DSOF at ¶ 31.

[12] The *Commerce* factors are: (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion. *Commerce Nat'l*, 214 F.3d at 438.

*mark.*" *Scott Paper Co.*, 589 F. 2d at 1232 (emphasis added). If a plaintiff "cannot prove that its mark possessed secondary meaning at the time defendant commenced its use, there can be no infringement, for if there was no secondary meaning [at that time], there was no likelihood of confusion when the junior user arrived on the scene." 2 *McCarthy on Trademarks and Unfair Competition* § 16:34 (5th ed.). *See also Investacorp, Inc. v. Arabian Investment Banking Corp.*, 931 F.2d 1519, 1524-27 (11th Cir. 1991) (granting summary judgment for defendant because plaintiff did not prove acquisition of secondary meaning in the five-year period before the defendant appeared); *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 565 (2d Cir. 1990) (finding mark unprotectable because plaintiff did not demonstrate that mark could have acquired secondary meaning in the short time before defendant began first use of its mark); *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) (dismissing case because the senior user did not prove that its mark acquired secondary meaning prior to the junior user's first use of the similar term); *Black & Decker Corp. v. Dunsford*, 944 F. Supp. 220, 227 (S.D.N.Y. 1996) (granting summary judgment for defendant because plaintiff did not show that "mark had achieved secondary meaning prior to the time defendant commenced use of the mark"); *Bachellerie v. Z. Cavaricci, Inc.*, 762 F. Supp. 1070, 1080 (S.D.N.Y. 1991) (granting summary judgment for defendant because plaintiff failed to prove acquisition of secondary meaning in the four-year "interval between the plaintiff's first use and defendant's first allegedly infringing use").

Here, according to Defendants, Plaintiffs have not met their burden of demonstrating that their marks attained secondary meaning at the time of Defendant's first use. This issue first came before the Special Master, who stated that "Plaintiffs have the affirmative duty to demonstrate

that their marks were entitled to protection at the time that Defendants were using the allegedly infringing marks," and ordered Plaintiffs to prepare their corporate representative to testify as to the date when Plaintiffs' marks acquired secondary meaning. Report and Recommendation of Special Master, ECF No. 245 at 6. On appeal of the Special Master's decision, the Magistrate Judge stated that, although Plaintiffs were not required to provide "the exact date that their marks acquired secondary meaning," they were, nonetheless, obligated to produce a Rule 30(b)(6) designee who would "be prepared to answer questions as to whether Plaintiffs assert that their marks had acquired secondary meaning *as of the time of Defendants' first actual use*, and the bases for that assertion." Order Accepting and Modifying Reports And Recommendations, ECF No. 266, at 3-4 (emphasis added). At the 30(b)(6) deposition, Plaintiffs produced Brian Tyburski, the President and CEO of Plaintiff-entities, who testified that he did not know when Defendants first used the marks, and, therefore, he did not testify as to whether the marks had attained secondary meaning by the first-use date. DSOF at ¶ 59.  When Defendants shifted gears and asked Tyburski whether the marks had attained secondary meaning at the time of the filing of either the Complaint or the FAC, Plaintiffs' counsel instructed him not to answer. *Id.* at ¶ 60.

Plaintiffs attempt to justify their failure to establish a date upon which the marks attained secondary meaning by arguing that Defendants have offered no firm date regarding use of their marks. As to some of the marks, Plaintiffs assert that Defendants have offered conflicting evidence as to when actual use commenced, relying on the first-use date in their PTO applications, but offering conflicting testimony as to the date of actual first use. ECF No. 280 at 25-26. For example, Plaintiffs point to the fact that for ONCNURSE, in various applications with the PTO, Defendants asserted a first-use-date of October of 2010, yet Defendants' corporate

representative admitted at his deposition that the mark was first used a title of a publication in September 2011. PSOF at ¶ 55. As to the other marks, Plaintiff contend that a date of first use is unknowable because Defendants never used the marks in commerce.

I find these arguments unpersuasive. This being Plaintiffs' case, they have the burden of proving that their marks had attained secondary meaning at the time of Defendants' first use. Recognizing this burden, the Magistrate Judge correctly ordered Plaintiffs to produce a corporate representative who could testify on exactly this issue. The corporate representative, however, presented *no testimony at all* as to the date that Plaintiffs' marks had acquired secondary meaning. That there may have been conflicting testimony regarding a first-use date on the part of Defendants does not absolve Plaintiffs of their responsibility. In 30(b)(6) depositions, parties have an obligation "to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter." *Black Horse Lane Assoc., L.P. v. Dow Chemical Corp.,* 228 F.3d 275, 303 (3d Cir. 2000) (quoting *Starlight Int'l Inc. v. Herlihy*, 186 F.R.D. 626, 639 (D.Kan. 1999)). This "duty of preparation goes beyond matters personally known to the designee or to matters in which the designee was personally involved, and if necessary the deponent must use documents, past employees or other sources to obtain responsive information." *Costa v. Cty. of Burlington,* 254 F.R.D. 187, 189 (D.N.J. 2008) (internal citations omitted). There is no indication that Mr. Tyburski was prepared to answer the question, and, indeed, at his initial deposition, he could not even testify as to definitions of "secondary meaning" or "acquired distinctiveness," testifying "I'm not a lawyer, I don't understand the legal

27

basis of 'distinctiveness and secondary meaning,' to have me give you a date." Declaration of

Michael L. Fialkoff, Exhibit 1, 155:21-23, ECF No. 277-4.[13]

Thus, because Plaintiffs have presented no evidence as to whether their marks acquired

secondary meaning by the date of Defendants' first use, the Court finds that Plaintiffs' marks

(aside from PEER-SPECTIVES) are descriptive marks without secondary meaning, and cannot

be the basis of a trademark infringement suit. *See Parks, LLC v. Tyson Foods, Inc.*, 186 F. Supp.

3d 405, 421 (E.D. Pa. 2016), *aff'd sub nom.*, 863 F.3d 220 (3d Cir. 2017) (stating that, at

summary judgment, plaintiff must show that its mark "had secondary meaning in the

marketplace when Defendants commenced the sale of their [allegedly infringing mark]"); *see*

*also* 2 *McCarthy on Trademarks and Unfair Competition* § 15:33 (5th ed.) ("A dismissal on

summary judgment may be appropriate where the plaintiff's only response to the motion is weak

evidence). [14]

---

[13] Moreover, Plaintiff's argument that there is no first-use-date because Defendants allegedly never used certain of their marks undermines the basis for the trademark infringement claims. In order to succeed on a claim for trademark infringement under the Lanham Act, a plaintiff must prove that the defendant actually used the allegedly infringing mark in commerce. *See Commerce Nat'l*, 214 F.3d at 437. Thus, were Plaintiffs serious in proceeding with this argument, then their trademark infringement claims would be dismissed, as Defendants have not sought to infringe in the first instance. *See Porter v. Senderowitz*, 158 F.2d 435, 438-39 (3d Cir. 1946) ("[A] plaintiff cannot recover unless the facts which constitute his cause of action are in existence at the time he begins his lawsuit.")

[14] Plaintiffs also argue that their marks are entitled to a presumption of secondary meaning based on 15 U.S.C. § 1052(f), which allows the PTO to accept as prima facie evidence that a mark has become distinctive "proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made." Aside from the fact that Plaintiffs had not been using any of the their marks for five years at the time the FAC was filed, Section 1052(f) applies only to the issue of registration at the PTO, not to litigation in federal court. *J & J Snack Foods Corp. v. Nestle USA, Inc.*, 149 F. Supp. 2d 136, 152 n.10 (D.N.J. 2001) (citing *In re Owens–Corning Fiberglas Corp.*, 774 F.2d 1116, 1125 (Fed. Cir. 1985) ("five year" rule applies to only trademark applications).

### B. Likelihood of Confusion

Although PEER-SPECTIVES, unlike the other at-issue marks, may be trademarkable, Plaintiffs only have a case for trademark infringement if there is a likelihood that any similarity between their mark and Defendants' mark—PEERS & PERSPECTIVES—would confuse a potential consumer. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769 (1992) ("It is, of course, also undisputed that liability under [the Lanham Act] requires proof of the likelihood of confusion.") (internal citations omitted). A "likelihood of confusion" exists where "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Ford Motor Co.,* 930 F.2d at 292 (quoting *Scott Paper Co.* 589 F.2d at 1229). Courts consider a variety of factors when assessing whether two marks are likely to cause consumer confusion,  including, but not limited to (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market. *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 463 (3d Cir. 1983).  The Third Circuit has "repeatedly insisted that the *Lapp* factors are not to be mechanically tallied, but rather that they are tools to guide a qualitative

decision." *A & H Sportswear, Inc.*, 237 F.3d at 216. Plaintiffs bear the burden of proving likelihood of confusion. *J & J Snack Foods Corp.*, 149 F. Supp. at 155.

Here, Plaintiffs address two of the *Lapp* factors in arguing that a likelihood of confusion exists between the at-issue marks. First, they argue that it is "highly likely" that Defendants' intentionally copied the Plaintiffs' mark because they filed for and adopted PEERS & PERSPECTIVES shortly after Plaintiffs filed PEER-SPECTIVES; intentional copying, according to Plaintiffs, creates a presumption of likelihood of confusion. Second, Plaintiffs assert that the phonetic parallel between the marks conclusively establishes a likelihood of confusion.

As to the first argument, Plaintiffs are incorrect that intentional copying creates a presumption of likelihood of confusion. While such a presumption may be the law of other circuits, the Third Circuit has stated that evidence of intent to copy neither creates a presumption nor relieves a plaintiff of the burden of proving a likelihood of confusion. *Am. Home Prods. Corp. v. Barr Labs., Inc.*, 834 F.2d 368, 371 (3d Cir. 1987). Rather, intent is only a factor "tending to suggest likelihood of confusion." *Id.* Moreover, and most crucially, Plaintiffs have produced no evidence suggesting that Defendants intended to copy Plaintiffs' mark. The alleged proximity in time of the two filings[15]—the only evidence offered by Plaintiffs—is not a showing of intent, and Plaintiffs also concede that Defendants were unaware of PEER-SPECTIVES at the time they began using PEERS & PERSPECTIVES. Plaintiffs' Response to DSOF ("PRDSOF") at ¶ 131.

---

[15] The record, in fact, supports that Defendants filed PEERS & PEERSPECTIVES two years after Plaintiffs filed PEER-SPECTIVES. PSOF at ¶¶ 121, 124.

Second, the Court finds that the marks are not so similar as to create a likelihood of confusion. "The single most important factor in determining likelihood of confusion is mark similarity." *Howard v. Laws*, No. 13-0957, 2014 WL 3925536, at *4 (D.N.J. Aug. 12, 2014) (quoting *A & H Sportswear, Inc.,* 237 F.3d at 216). Marks are confusingly similar if "ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection, or sponsorship." *A & H Sportswear, Inc.*, 237 F.3d at 216 (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 476 (3d Cir. 1994)). In considering the similarity between the two marks, the courts typically "compare the appearance, sound and meaning of the marks, as well as the manner in which they are used." *Taj Mahal Enterprises, Ltd. v. Trump*, 745 F.Supp. 240, 247 (D.N.J. 1990) (citing *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 824 (D.N.J. 1980)). When "making such a comparison, the relevant factor is 'the overall impression created by the mark as a whole rather than simply comparing the individual features of the marks.'" *Id.* (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983)).

Here, Plaintiffs contend that the phonetic similarity between the marks is the crucial factor weighing in favor of likelihood of confusion. Undoubtedly, there is similarity between the marks: PEER-SPECTIVES is merely a combined, shortened version of the words PEERS & PERSPECTIVES. Yet despite the similarities, there is a definite phonetic difference between the two marks, as PEER-SPECTIVES "bleeds two words together" while PEERS & PERSPECTIVES "consists of three discrete words." *A & H Sportswear,* 237 F.3d at 217 (finding that "The Miracle Bra" and "Miraclesuit" were not phonetically similar because Miraclesuit "bleeds two words together while The Miracle Bra consists of three discrete words"). Moreover,

31

both marks have a different number of syllables and different stress patterns. *See John M. Middleton, Inc. v. Swisher Int'l, Inc.*, No. 03-3908, 2006 WL 2129209, at *3 (E.D. Pa. July 26, 2006) (considering syllable and stress pattern similarity in deciding phonetic similarity).

Aside from phonetic dissimilarity, the marks are further distinguished by their appearance and the manner in which they are used. Defendants' use of PEERS & PERSPECTIVES is not in connection with a stand-alone publication and is used only in conjunction with Defendants' MD MAGAZINE mark, such that it always appears as MD MAGAZINE, PEERS & PERSPECTIVES. DSOF at ¶ 127. *See Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998) (Different context of colors, typeface and appearance of product on which the marks appear lead to conclusion that there is no likelihood of confusion: "While the two names sound similar, the trademarks themselves are not confusingly similar, given the context in which a purchaser sees them."). Plaintiffs and Defendants also used the marks in different manners: PEER-SPECTIVES is used in connection with online and in-person continuing medical education courses while PEERS & PERSPECTIVES is used as part of a publication title. Given these distinctions, and because Plaintiffs have presented no evidence regarding any of the other *Lapp* factors (including any evidence of actual consumer confusion between the marks), the Court finds that PEER-SPECTIVES and PEERS & PERSPECTIVES "are not confusingly similar, nor is there a practical *likelihood* that a potential shopper will be confused, or deceived or mistaken by any similarities existing as to the parties' respective products." *Johnson & Johnson v. Colgate-Palmolive Co.*, 345 F. Supp. 1216, 1222 (D.N.J. 1972) (emphasis in original).

Thus, because, based on these undisputed facts, no likelihood of confusion exists between the two marks, PEER-SPECTIVES and PEERS & PERSPECTIVES, and because Plaintiffs' remaining marks are not protectable, summary judgement is warranted in favor of Defendants as to Plaintiff's trademark infringement claims.

## C. Declaratory Judgment Counterclaim

Defendants also seek summary judgment on its declaratory judgment counterclaim that certain of Plaintiffs' marks—in addition to the marks at-issue in the FAC—are unenforceable as descriptive and lacking secondary meaning. The Declaratory Judgment Act ("DJA") requires an "actual controversy," and provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201 (a). Here, the parties do not dispute the existence of such a case or controversy, and, in fact, have stipulated to the existence of Defendants' potentially infringing marks.[16]

---

[16] Even if there were such a dispute, Defendants have sufficiently demonstrated the existence of "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, (2007) (citations omitted). First, the parties have adverse legal interests because they have "potentially conflicting claims to certain, articulated intellectual properties." *Telebrands Corp. v. Exceptional Prod. Inc.*, No. 11-CV-2252, 2011 WL 6029402, at *2 (D.N.J. Dec. 5, 2011). Second, the "the controversy is substantial because it affects the business of both parties and their respective abilities to sell their products." *Id.* Third, and most crucially, the controversy is of sufficient immediacy and reality. The history of litigiousness between the parties—including the present drawn-out, 6-year dispute based on marks that Defendants allegedly never used—as well as Plaintiffs' statements indicating that they typically file suit even before there has been actual infringement, *see* DSOF at ¶ 158 ("[w]e filed the complaint because the Defendants filed an application for our exact mark after our filings, so we protect our assets before we actually get to confusion in the field, we protect our assets"), are sufficient to demonstrate that a potential dispute is of sufficient immediacy to permit a declaratory judgment action. *See PharmaNet, Inc. v. DataSci Liab. Co.*, No. 08-2965, 2009 WL

At issue are two classes of Plaintiffs' marks. The first class is comprised of marks that were filed with the PTO on an intent-to-use basis by Plaintiffs: These marks include: PERSONALIZED VALUE-BASED CANCER CARE, PERSONALIZED MEDICINE IN IMMUNOLOGY, PERSONALIZED BREAST CANCER, VALUE-BASED BREAST CANCER, RHEUMATOLOGY BUSINESS MANAGEMENT, DERMATOLOGY BUSINESS MANAGEMENT, and DIABETES BUSINESS MANAGEMENT. DSOF at ¶ 159. The second class includes marks that, although not registered on an intent-to-use basis, have allegedly been in use at least for some period of time. These are: PERSONALIZED MEDICE IN HEMATOLOGY/ONCOLOGY, PERSONALIZED MEDICINE IN RHEUMATOLOGY, VALUE-BASED CARE IN MULTIPLE MYELOMA, VALUE-BASED ONCOLOGY BENEFIT DESIGN, CLINICAL ONCOLOGY PHARMACY, VALUE-BASED CARE IN RHEUMATOLOGY, and PERSONALIZED CANCER CARE. DSOF at ¶ 163.

I find that Plaintiffs have not carried their burden of demonstrating that there is any meaningful difference between the marks at issue in Defendants' Counterclaim, and the 15 marks that I already found to be descriptive. Indeed, in declaratory judgement actions, although the usual orientation of the rights holder as plaintiff and the accused infringer as defendant is reversed, this does not change the normal rule that the party claiming intellectual property rights has the burden to prove infringement. *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 194 (2014). Plaintiffs have presented neither argument nor evidence that these

---

396180, at *7 (D.N.J. Feb. 17, 2009) (finding sufficient immediacy in declaratory judgment action based on party's prior litigation against *other, unrelated* companies, and statements threatening suit).

marks, which appear nearly identical to the marks already held to be descriptive, are not descriptive. Nor have Plaintiffs produce *any* evidence to counter Defendants' assertion that these marks have not attained secondary meaning, such as survey evidence or customer testimonials indicating that any of these marks function as a designation of source. DSOF ¶¶ 168-169.[17] As such, the Court will grant summary judgment on Defendants' declaratory judgment counterclaim that these marks are not trademarkable.

## IV. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs move for summary judgment seeking a declaratory judgment cancelling and/or striking certain of Defendants' trademark registrations or applications for failure to ever use the offending marks in commerce. For the following reasons, the Court lacks subject matter jurisdiction to grant Plaintiffs' requested relief.

The only statute that Plaintiffs cite in seeking cancellation, 15 U.S.C.A. § 1064, relates only to administrative Trademark Board proceedings in the PTO, and does not authorize suits for cancellation in a federal District Court. *Windsurfing Intern. Inc. v. AMF Inc.*, 828 F.2d 755, 758, 4 U.S.P.Q.2d 1052 (Fed. Cir. 1987). The applicable statute governing the District Court's powers with respect to trademark registrations, 15 U.S.C. § 1119, makes clear that in federal

---

[17] Indeed, in Plaintiffs' opposition brief, the only argument that can be construed as responding to Defendants' declaratory judgment counterclaim is that summary judgement should be denied because Defendants have acted with "unclean hands." Application of the 'unclean hands' doctrine rests with the discretion of the court, which is 'not bound by formula or restrained by any limitation that tends to trammel on the free and just exercise of discretion.'" *Aris-Isotoner Gloves, Inc.*, 792 F. Supp. at 969-70 (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933)). Here, Plaintiffs' unclean hands theory fails because Plaintiffs have not shown that Defendants are "guilty of fraud, unconscionable conduct, or bad faith directly related to the matter at issue that injures the other party and affects the balance of equities." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 (3d Cir. 1999).

court, cancellation is a remedy, not a cause of action, that does not, by itself confer federal jurisdiction. *See Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 873-74 (3d Cir. 1992) ([A] controversy as to the validity of or interference with a registered mark must exist before a district court has jurisdiction to grant the cancellation remedy."). Thus, Plaintiffs would have to prevail on a separate cause of action (i.e., infringement) in order for Court-ordered cancellation to be permissible. Because the Court has granted Defendants' motion for summary judgment in its entirety and dismisses Plaintiffs' claims, there is no separate cause of action under which Plaintiffs can seek cancellation.

That Defendants framed their claim as a declaratory judgment does not alter the analysis, as "[t]he procedural device of declaratory judgment should not be used to short-circuit the power of the Patent and Trademark Office to consider cancellation of federal registrations." 5 *McCarthy on Trademarks and Unfair Competition* § 30:110 (5th ed.); *see also Nike, Inc. v. Already, LLC*, 663 F.3d 89, 98 (2d Cir. 2011), *cert. granted,* 133 S. Ct. 24 (2012) *and aff'd*, 133 S. Ct. 721 (2013) (holding that declaratory judgement counterclaim for cancellation under § 1119 is insufficient to support federal jurisdiction where the underlying infringement suit had been resolved).

Thus, Plaintiffs' motion for summary judgment seeking cancellation of Defendants' marks is denied.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgement is **GRANTED** in its entirety, Plaintiffs' motion for summary judgment is **DENIED** in its entirety, and all claims against Defendants are, therefore, **DISMISSED**.

Dated: November 29, 2018                    /s/ Freda L. Wolfson
                                            Hon. Freda L. Wolfson
                                            United States District Judge